JUDGE SWAIN

MARK K. SCHONFELD (MS-2798)
Regional Director
Northeast Regional Office
SECURITIES AND EXCHANGE COMMISSION
233 Broadway
New York, New York 10279
(646) 428-1650
Attorney for Plaintiff

05 CV 3308

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

ANURADHA D. SAAD, RICHARD P. ADELSON, DAVID J. CAMMARATA, PETER TORRES, ROBERT MCKIE, KARIN GARDNER, and KENNETH JUGAN,

Defendants.

Civil Action No.

COMPLAINT

RECEIVED MAR 29 2005 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against defendants Anuradha D. Saad ("Saad"), Richard P. Adelson ("Adelson"), David J. Cammarata ("Cammarata"), Peter Torres ("Torres"), Robert McKie ("McKie"), Karin Gardner ("Gardner") and Kenneth Jugan ("Jugan"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. From 1999 until 2003, the defendants engaged in a fraudulent scheme to inflate the reported financial results of IMPATH Inc. ("Impath"), a public company that provided diagnostic and other laboratory services used in the treatment of cancer. As a result of the defendants' fraudulent accounting practices, Impath falsely reported multimillion dollar profits

when it had actually suffered huge losses. To meet financial projections and boost Impath's stock price, the defendants made, or directed others to make, phony accounting entries that artificially increased revenue and improperly reduced operating expenses.

2. Defendants Saad, Adelson and Cammarata -- respectively, Impath's former chief executive officer ("CEO"), chief operating officer ("COO") and chief financial officer ("CFO") -- directed the fraud. Defendants Torres, Gardner and Jugan were senior members of Impath's corporate finance department and implemented the fraud by making, and directing members of their staff to make, the improper journal entries needed to carry out the scheme. Each quarter, Torres conferred with Saad, Adelson or Cammarata about the gap between actual and projected results, and they told Torres how much phony revenue they wanted the finance department to record. Defendant McKie was in charge of one of Impath's subsidiaries and, together with other defendants, fraudulently capitalized his unit's operating expenses to inflate net income, and recognized revenue on a large transaction that never occurred. Each defendant also engaged in misconduct designed to deceive Impath's outside auditor ("Auditor") and conceal the fraud.

3. As a result of the foregoing conduct, Impath filed annual and quarterly reports with the Commission that included, among other misrepresentations and omissions, materially false and misleading financial statements. Saad, Adelson, Cammarata and Torres each signed one or more of the periodic reports with full knowledge that those reports and the corresponding press releases announcing quarterly earnings materially misrepresented Impath's financial results.

4. Saad, Adelson and Cammarata also engaged in undisclosed self-dealing. Not only did they exercise stock options and sell Impath stock during the fraud, they used corporate funds to pay for option exercises without obtaining board approval or making the required proxy

statement disclosures. Saad also used corporate funds to pay for other personal expenses without the requisite approval or disclosure, including vacations, country club dues and artwork.

5. Once touted by analysts and the press as one of America's fastest growing small companies, Impath unraveled soon after announcing an audit committee investigation into "possible accounting irregularities" on July 30, 2003. Within two months of that press release, Impath was delisted by the Nasdaq, lost most of its market capitalization and filed for bankruptcy. Impath is currently being liquidated under Chapter 11 of the Bankruptcy Code and no longer exists as an operating entity.

6. By virtue of the foregoing conduct, each of the defendants, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations, or give rise to liability for violations, of the federal securities laws and rules and regulations thereunder, as follows:

(a) Saad violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and she is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Impath's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and she is further liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person, for Impath's violations of Sections 13(a), 13(b)(2) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2) and 78n(a)] and Rules 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9];

(b) Adelson and Cammarata violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13 (b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and each of them is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Impath's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and they are further liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as controlling persons, for Impath's violations of Sections 13(a), 13(b)(2) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2) and 78n(a)] and Rules 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9];

(c) Torres violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Impath's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13]; and

(d) McKie, Gardner, and Jugan violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1]; and each of them is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Impath's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78(m)(b)(2)] and Rules

10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

7. Unless the defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

**JURISDICTION AND VENUE**

8. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and enjoin the defendants from engaging in the acts, practices, transactions and courses of business alleged herein. The Commission also seeks an order: (a) requiring the defendants to disgorge the ill-gotten gains received as a result of the violations for which they are liable and pay prejudgment interest on those amounts; (b) requiring the defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, as to Saad, Adelson, Cammarata and Torres, also pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and (c) prohibiting Saad, Adelson, Cammarata and Torres from acting as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

9. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

10. The defendants, directly and indirectly, have made use of the means or instrumentalities of, or the means or instruments of transportation or communication in, interstate

commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein. Many of these transactions, acts, practices and courses of business occurred in the Southern District of New York, where Impath's principal offices were located.

## THE DEFENDANTS

11. **Saad,** age 48, was Impath's CEO from 1993, and chairman of its board of directors from 2001, until February 2003, when she was forced to resign for misusing corporate funds.

12. **Adelson,** age 39, was Impath's COO from 1999, and its president from 2001, until May 2003, when he was asked to resign.

13. **Cammarata,** age 40, is a certified public accountant and was Impath's CFO from 1999 until his termination in May 2002.

14. **Torres,** age 35, became Impath's controller in 1999 and also vice president of corporate finance in January 2002. He resigned in July 2003. Before joining Impath, Torres worked for the Auditor as an accountant and participated in audit work related to Impath.

15. **McKie,** age 40, joined Impath in 1999, when Impath acquired a private cancer testing business in which he was a partner. The partnership's business operations were merged into an Impath subsidiary called Impath Predictive Oncology, Inc. ("Predictive Oncology"), and McKie served as its vice president for finance and operations until his resignation in May 2003.

16. **Gardner,** age 33, became Impath's assistant corporate controller in May 2000 and was promoted to controller in December 2002. She resigned in July 2003. Before joining Impath, Gardner worked for the Auditor as an accountant and participated in audit work related to Impath.

17. **Jugan,** age 43, was Impath's national billing director from 1998 until he resigned from that position in July 2003.

## RELEVANT ENTITY

18. During the time of the transactions and events alleged herein, **Impath**: (a) was a Delaware corporation with principal offices in New York, New York; (b) engaged in providing services to health care providers involved in the treatment of cancer and selling tissue specimens to biopharmaceutical companies for the development of gene-based cancer treatments; and (c) was a public company whose common stock was traded on the Nasdaq National Market and registered with the Commission pursuant to Section 12(g) of the Exchange Act. Impath filed a bankruptcy petition on September 29, 2003, and its common stock was deregistered on July 1, 2004.

## BACKGROUND

19. Before its collapse, Impath was perceived to be one of the fastest growing small companies in the country. Impath's press releases touted "record revenues" and a long string of consecutive profitable quarters. Magazines such as *Fortune* and *Forbes* listed Impath as one of the best and most dynamic small companies and featured glowing portraits of Saad's leadership. Impath's reported net revenue rose from $37 million in 1997 to $138 million in 2000 and peaked at $188 million in 2002. Meanwhile, its market capitalization went from $103 million in early 1997 to a peak of $1.2 billion in November 2000. The truth is that Impath achieved its reported financial results through fraud.

20. Faced with pressure from Saad to "hit the numbers," Adelson, Cammarata and other executives feared that a failure to report results in line with Wall Street estimates and the projections management made to the board would decimate the stock and cost them their jobs.

Saad also derived material benefits from the inflated stock price and her status as a successful CEO. Not only was she was highly compensated and sold thousands of shares of Impath stock at inflated prices, she misused corporate funds to pay for some of her option exercises and often charged personal expenses to her company credit card.

21. The financial covenants governing Impath's $50 million credit facility gave the defendants further incentive to engage in fraud. Impath had severe cash flow problems and could not survive without this credit facility. The credit facility was secured primarily by accounts receivable, and disclosing the company's true financial condition would have triggered a default.

## THE FINANCIAL FRAUD SCHEME

22. The defendants engaged in a fraudulent scheme to inflate revenue, earnings and other measures of financial performance in order to keep the stock price afloat by creating the false appearance that Impath met its projections for revenue growth and steady profits. The scheme resulted in material misstatements of revenue, earnings and other financial information reported by Impath for annual and quarterly reporting periods from 1999 through the first quarter of 2003. With blatant disregard for generally accepted accounting principles ("GAAP") and their financial reporting obligations, the defendants used multiple fraudulent practices to align Impath's reported financial results with market expectations.

23. The fraudulent accounting practices involved Impath's two principal subsidiaries, the Predictive Oncology unit operated by McKie and Impath Physician Services, Inc. ("Physician Services"). Saad, Adelson and Cammarata directed the scheme, while Torres, McKie, Gardner and Jugan carried out the fraudulent practices and took steps designed to conceal the fraud from the Auditor.

**Manipulating The Results For Physician Services**

24. Physician Services performed laboratory procedures on cancer specimens and was Impath's largest operating unit, often accounting for more than 80 percent of Impath's reported revenue. In 1999, Impath began using an automated system, known as "Impulse," to monitor and record all testing and billing activity for each cancer specimen received by Physician Services. Each specimen received for testing was referred to as a "case." Impath billed the cost of the testing to a third-party payer such as Medicare or an insurance company, the hospital or other institution, or the patient. After the tests were performed, Impulse automatically issued an invoice but was not linked to the general ledger. To record revenue and accounts receivable, the accounting staff manually posted journal entries to the general ledger. Starting with the results for fiscal year ended December 31, 1999 ("FY 1999"), the amounts of revenue and accounts receivable for Physician Services that were recorded in the general ledger and publicly reported by Impath materially exceeded the amounts invoiced through Impulse.

25. During the relevant period, all the defendants except McKie routinely inflated Physician Services' revenue and accounts receivable to match the projections that management had provided to the board. At the direction of Saad, Adelson and Cammarata, the other three defendants involved in this practice -- Torres, Gardner and Jugan -- simply "plugged" millions of dollars of fictitious revenue and accounts receivable into the general ledger and fabricated documents to conceal the variance between the amounts in Impulse and the general ledger.

26. Cammarata, Torres and Gardner directed their staff to post phony journal entries to the general ledger in order to record revenue and accounts receivables that did not appear in Impulse. While Cammarata was CFO, he and Torres selected the amounts based on what Saad and Adelson had projected to the board, and then Torres instructed Gardner and the accounting

staff to post the additional journal entries needed to make those amounts appear on the general ledger. Torres and Gardner prepared phony "adjusting" journal entries in the requisite amounts and provided them to their clerical staff for posting without any back-up documentation.

27. After Cammarata's departure, Saad and Adelson worked directly with Torres to decide how much revenue they needed to fabricate each quarter to align Impath's reported results with market expectations and board projections. At the end of each quarter, Torres presented Saad and Adelson with alternative scenarios based on different inflated "case" volume numbers and analyzed the impact of each scenario on revenue growth, earnings-per-share, the days-sales-outstanding figure, and the revenue and receivable variances between Impulse and the general ledger. Saad and Adelson reviewed the options presented by Torres and told him how much fictitious revenue to record. Saad and Adelson also knew that the scheme to overstate Physician Services revenue and accounts receivable inflated Impath's reported results prior to Cammarata's departure, and that inflated case volume numbers, rather than the actual figures, were used since FY 1999 to determine the reported revenue amounts.

28. The variances between Impulse and the general ledger grew progressively larger each quarter. To decrease the risk of detection, Torres and Gardner began spreading the false journal entries among different general ledger accounts. Their clerical staff eventually began making a special notation on the general ledger to indicate the absence of documentary or other support for these entries. The number and size of the entries marked with this special notation grew as the fraud progressed. By the fourth quarter of the fiscal year ended December 31, 2002 ("FY 2002"), these specially marked entries to the revenue accounts totaled $24.2 million and accounted for approximately 50% of the revenue recorded in that quarter.

29. Cammarata, Torres, Gardner, and Jugan also fabricated documents designed to prevent the Auditor from detecting the revenue and receivables variance between Impulse and the general ledger. Accountants working for the Auditor typically compared the general ledger balances with those reflected in an Impulse summary page provided by management. With Cammarata's authorization, Torres, Gardner and Jugan created a phony summary page by dropping the actual summary data into an electronic spreadsheet and altered the data to conform to the amounts in the general ledger. Torres and Jugan also doctored the accounts receivable "aging reports," which analyzed the outstanding receivables according to how long ago payment was due, to make the data conform to the general ledger before making the aging reports available to the Auditor.

30. Torres, Gardner and Jugan fabricated the documents described in paragraph 29 for fourteen straight quarters, from the fourth quarter of FY 1999 through the first quarter of 2003, and each quarter Jugan delivered the phony documents to the Auditor. Adelson knew of, and approved, the steps Cammarata, Torres, Gardner and Jugan took to try to prevent the Auditor from discovering the fraud.

**Manipulating The Results For Predictive Oncology**

31. During this same period, Adelson, Cammarata, Torres, McKie and Gardner also fraudulently manipulated the results for the Predictive Oncology unit by improperly capitalizing millions of dollars of ordinary operating expenses and reporting revenue on a large transaction that never occurred.

**Improper Capitalization Of Operating Expenses**

32. Predictive Oncology consisted of several different business units that provided resources designed to assist pharmaceutical companies in the development of cancer treatments.

One of Predictive Oncology's principal assets was "GeneBank," a repository of thousands of tumor tissues, other biological specimens and clinical follow-up information. Cammarata, Torres, McKie and Gardner artificially inflated net income by improperly capitalizing almost $16 million of ordinary operating expenses that they falsely treated as costs incurred in connection with the purchase of tissue for GeneBank.

33. Under GAAP, it was permissible for Predictive Oncology to capitalize (*i.e.*, record as an asset) the cost of tissue purchases, because the tissue was an asset that had economic value for a period of time that extended beyond the accounting period in which it was acquired. The cost of such an asset is capitalized by recording an asset on the balance sheet in the amount of the cost and then amortizing the cost over the course of the asset's useful life. The cost of the asset is amortized by recording a proportionate amount of the total cost as an expense on the income statement for each accounting period within the useful life of the asset. Under GAAP, ordinary operating expenses, such as salaries and office supplies, may not be capitalized and must instead be recorded in their entirety on the income statement in the period in which they are incurred.

34. In or before 2001, accountants working for the Auditor informed Cammarata and Torres that while GAAP permitted Impath to capitalize Predictive Oncology's tissue purchases, it was impermissible to capitalize the other expenditures made in connection with GeneBank. With Cammarata's approval, Torres, McKie and Gardner ignored the Auditor's instructions and routinely capitalized ordinary operating expenses, falsely recording them as tissue purchases. As a result of this fraudulent practice, Impath understated operating expenses and overstated net income from the second quarter of 2001 through the first quarter of 2003.

35. During this period, Impath capitalized a total of $19.4 million in purported GeneBank expenditures: $5 million in the fiscal year ended December 31, 2001 ("FY 2001"), $13.3 million in FY 2002, and $1.1 million in the first quarter of 2003. These amounts appeared as intangible assets on the balance sheet and were described in Impath's annual report on Form 10-K for FY 2002 as "[p]ayments to acquire tissue and tumor samples for use in GeneBank." In truth, Predictive Oncology spent less than $3.5 million on actual tissue purchases during this entire period. The other $15.9 million included ordinary operating expenses such as employee benefits, lab supplies, promotional materials, maintenance costs, office supplies, and software. Some of these items did not even relate to GeneBank or to the Predictive Oncology unit. With the approval of Cammarata and McKie, Torres and Gardner made improper reclassification entries to capitalize items that were originally recorded as operating expenses.

36. As a result of the improper capitalization of operating expenses described above, Impath's net income was overstated by $2.8 million for FY 2001 and $5.7 million for FY 2002. The improper capitalization of operating expenses also resulted in an overstatement of Impath's net intangible assets by $5 million as of December 31, 2001 and $14.7 million as of December 31, 2002.

37. With Cammarata's approval, Torres, McKie and Gardner took steps designed to hide the improper capitalization of operating expenses from the Auditor. Torres and Gardner falsely represented to the Auditor that all the capitalized amounts involved tissue purchases. In addition, McKie manipulated the Predictive Oncology unit's automated accounting system in an effort to prevent the Auditor from detecting that Predictive Oncology had not really made tissue purchases in the reported amounts.

**Improper Revenue Recognition**

38. Adelson, McKie and Torres also improperly overstated the revenue attributed to the Predictive Oncology unit in December 2002.

39. At the end of December 2002, a member of McKie's accounting staff issued an invoice to a pharmaceutical company for a $566,000 tissue sale even though the pharmaceutical company had not agreed to purchase the tissue. At that time, representatives of the pharmaceutical company and McKie's sales staff were discussing the terms of a potential transaction, but the pharmaceutical company's representatives had done nothing more than request a price quote for certain tissue samples. The invoice, however, purported to bill the pharmaceutical company for every item for which its representatives had requested a price quote. After receiving the invoice, the pharmaceutical company immediately demanded that Impath rescind the invoice and made clear to McKie's sales personnel that the pharmaceutical company had not agreed to purchase the invoiced items.

40. McKie was aware of the true status of the transaction at all relevant times. McKie also knew that even if the pharmaceutical company had agreed to purchase all of the invoiced items, Impath could not possibly ship all of those items by the end of December 2002. McKie had discussed the matter with Adelson and Torres, and the three of them had agreed that, in order to record the revenue in FY 2002, Predictive Oncology would ship as much tissue as possible by December 31, 2002 and bill the pharmaceutical company for the full amount. Despite knowing that the pharmaceutical company had not agreed to purchase, and Impath had not shipped, the invoiced items by December 2002, McKie had his accounting staff record $566,000 in revenue on the Predictive Oncology books in December 2002 on the basis of the inaccurate invoice.

41. By January 2003, the potential transaction between Predictive Oncology and the pharmaceutical company had completely fallen apart, and McKie informed Adelson of that fact before Impath filed its annual report on Form 10-K for FY 2002. Despite knowing that it was improper to recognize any revenue in connection with this transaction, Adelson and McKie decided to keep the transaction on the books and include the $566,000 in Impath's reported revenue for the fourth quarter of FY 2002. The revenue recognized on this transaction accounted for more than 10% of the total revenue attributed to the Predictive Oncology unit in Impath's financial statements for the fourth quarter of 2002.

**UNDISCLOSED SELF-DEALING**

42. In addition to the accounting fraud, Saad, Adelson, and Cammarata also engaged in undisclosed self-dealing to enrich themselves at the expense of Impath's public shareholders. Without board approval or the requisite disclosure to the public, they misused corporate funds to provide themselves with additional compensation to which they were not entitled.

43. Saad, Adelson, and Cammarata misappropriated a total of $851,000 in corporate funds to pay for the costs they incurred when exercising stock options in the first quarter of 2001 and, in Adelson's case, also in the first quarter of 2002. The stock options granted by Impath entitled the executive to purchase a specified number of shares of Impath stock from Impath at a specified price per share. When exercising an option -- *i.e.* purchasing the stock from Impath at the specified price -- the executive was required, under the terms of the stock option plan, to pay Impath for the cost of purchasing the shares, *i.e.* the exercise cost. Instead of using their own funds to pay for the exercise costs, as required by the terms of the option plan, Saad, Adelson, and Cammarata used Impath's own money, effectively giving themselves an interest-free loan from Impath in the amount of the exercise cost. They did so without the authorization or

knowledge of Impath's board of directors, and they never disclosed these "loans" in the relevant periodic reports and proxy statements filed with the Commission.

44. Saad, Adelson and Cammarata left Impath without repaying the full amount of the funds they misappropriated from Impath in the manner described in paragraph 43. Saad never repaid Impath any of the $352,000 that she had misappropriated. Cammarata repaid only $80,000 of the $220,000 that he owed, and Adelson repaid only $152,000 of the $279,000 that he owed. When Saad, Adelson and Cammarata left Impath, the amounts that they still owed were not set off against their severance payments.

45. Saad also misappropriated corporate funds to pay for other personal expenses. Impath's board of directors forced Saad to resign in February 2003 after discovering that Saad had used her corporate credit card to pay hundreds of thousands of dollars of personal expenses, including vacations, country club dues and artwork. When she was terminated from Impath, Saad agreed, after negotiations with the company, to reimburse Impath $250,000 for the misuse of her corporate credit card. She nevertheless received a large severance payment.

46. Saad and Cammarata also received unauthorized advances on their performance bonuses that were not deducted when the bonuses were paid. Saad received $38,000 of these advances, and Cammarata received $15,000.

47. Impath issued two proxy statements during the relevant period, dated April 30, 2002 and May 14, 2003, that failed to disclose the additional compensation received by Saad, Adelson, and Cammarata. All three of them participated in the preparation of the April 30, 2002 proxy statement, and Saad and Adelson participated in the preparation of the May 14, 2003 proxy statement. The April 30, 2002 proxy statement purported to set forth the compensation of Saad, Adelson and Cammarata for 2001, but the proxy statement did not disclose that these officers

received significant additional compensation -- $352,000 for Saad, $279,000 for Adelson and $220,000 for Cammarata -- when they used corporate funds to pay for the cost of exercising stock options. The May 14, 2003 proxy statement purported to set forth the compensation that Saad and Adelson received for 2001 and 2002, but similarly failed to disclose any of the extra compensation that they received in those years. Neither proxy statement disclosed the additional compensation that Saad received by using a corporate credit card to pay for personal expenses, or the bonus advances that she and Cammarata received but never paid back.

## IMPATH'S INFLATED FINANCIAL RESULTS

48. During the relevant period, Impath distributed materially false and misleading information to the public concerning its quarterly and annual financial results.

49. Impath issued press releases announcing its purported financial results for the 1999, 2000, 2001, and 2002 fiscal years, and for interim periods within those years and the first quarter of 2003. In many of those press releases, Impath touted, among other things, another "consecutive quarter of record revenues." Impath filed periodic reports with the Commission on Form 10-K for the foregoing fiscal years and on Form 10-Q for the foregoing interim periods. Saad, Adelson, Cammarata, and Torres each signed one or more of these periodic reports on Impath's behalf. Due to the conduct of all the defendants, the revenue, net income and other information contained in the foregoing press releases and periodic reports were materially misstated.

50. Although Impath was delisted and never publicly restated its financial results, the company filed amended tax returns in early 2005 based on revised financial statements prepared by forensic accountants retained in Impath's bankruptcy case. These revised financial statements illustrate the extensive scope of the accounting fraud. In FY 2001 and FY 2002, for example,

Impath reported pre-tax profits of $19.5 million and $18.4 million, respectively. In fact, Impath lost approximately $11.8 million in FY 2001 and $14.4 million in FY 2002.

51. Using data from the amended returns, the accounting fraud had the following quantitative impact on Impath's reported revenue, accounts receivable and pre-tax net income in the four relevant fiscal years:

| (amounts in millions) | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| **Accounts receivable, net** | | | | |
| Original Form 10-K | $35.5 | $50.7 | $63.6 | $69.0 |
| Adjusted amount | $25.6 | $35.9 | $39.5 | $26.9 |
| Percentage difference | 28% | 29% | 38% | 61% |
| **Net revenue** | | | | |
| Original Form 10-K | $85.4 | $138.2 | $189.6 | $188.1 |
| Adjusted amount | $70.9 | $123.9 | $163.3 | $165.3 |
| Percentage difference | 17% | 10% | 14% | 12% |
| **Income (loss) before taxes** | | | | |
| Original Form 10-K | $13.7 | $22.7 | $19.5 | $18.4 |
| Adjusted amount | ($0.8) | $8.4 | ($11.8) | ($14.4) |
| Percentage difference | N/A | 63% | N/A | N/A |

52. The quarterly results reported by Impath during this period and in the first quarter of 2003 were misstated to similar degrees.

## THE USE OF FALSE PERIODIC REPORTS TO REGISTER SECURITIES

53. In addition to signing Impath's periodic reports during the relevant period, Saad, Adelson, Cammarata, and Torres also signed registration statements in which one or more of those false and misleading periodic reports were incorporated by reference. From May 2000 through July 2002, Impath filed four registration statements on Form S-8 to register millions of shares of common stock in conjunction with various executive and employee stock option plans.

54. In May 2000, Impath filed a registration statement on Form S-8 that incorporated by reference Impath's Form 10-K for FY 1999. In August 2001, Impath filed a registration

statement on Form S-8 that incorporated by reference Impath's Form 10-K for FY 2000 and Forms 10-Q for the quarters ended March 31, 2001 and June 30, 2001. In January 2002, Impath filed a registration statement on Form S-8 that incorporated by reference the Form 10-K for FY 2000 and the Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2001. Saad, Adelson and Cammarata signed, and failed to correct, these three registration statements even though they knew that the periodic reports incorporated therein were materially false and misleading.

55. In July 2002, Impath filed a registration statement on Form S-8 that incorporated by reference the Form 10-K for FY 2001 and Impath's Form 10-Q for the quarter ended March 31, 2002. Saad, Adelson, and Torres signed, and never corrected, this registration statement even though they knew that the periodic reports incorporated therein were materially false and misleading.

## THE DEFENDANTS' GAINS FROM THE FRAUD

56. All the defendants profited from their fraud. The defendants' gains from the fraud totaled millions of dollars and included, among other things, substantial incentive compensation and the proceeds of selling Impath securities at market prices that were inflated as a result of the accounting fraud. In addition to the undisclosed benefits described in paragraphs 42-47, Saad, Adelson and Cammarata received performance bonuses, severance payments and other compensation. All three of them also sold thousands of shares of Impath stock that they had acquired by exercising stock options priced below the inflated market price. Torres, McKie, Gardner, and Jugan received performance bonuses and other compensation. Torres and Jugan also sold shares of Impath stock that they had acquired by exercising stock options priced below the inflated market price.

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5**

(All Defendants)

57. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 56.

58. Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

59. As part and in furtherance of the violative conduct, Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan, directly or indirectly, singly or in concert, knowingly or recklessly, engaged in a fraudulent scheme to inflate Impath's reported financial results through phony revenue adjustments to the general ledger, improper capitalization of ordinary operating expenses and other fraudulent practices. In addition, Saad, Adelson, and Cammarata directly or indirectly, singly or in concert, knowingly or recklessly, failed to disclose substantial amounts of additional compensation that they obtained from Impath, without board approval, by misusing corporate funds to pay for stock option exercise costs and other personal benefits.

60. As part and in furtherance of the violative conduct, Impath issued press releases and filed with the Commission the periodic reports and proxy statements described in paragraphs 49, 54 and 55. Due to the fraudulent practices in which the defendants engaged, these documents contained financial statements that materially overstated Impath's revenue and net income for the subject reporting periods and other material misstatements concerning Impath's financial performance and executive compensation. As a result, the press releases, periodic reports and proxy statements described in paragraphs 49, 54 and 55 were materially false and misleading.

61. The defendants knew or were reckless in not knowing that because of their fraudulent conduct and the fraudulent conduct of others, the press releases, periodic reports and/or proxy statements described in paragraphs 49, 54 and 55 were materially false and misleading.

62. By reason of the foregoing, Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

63. By reason of the foregoing, Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan, singly or in concert, directly or indirectly, also aided and abetted Impath's violations, and unless enjoined will again aid and abet violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5**

(Saad, Adelson, Cammarata and Torres)

64. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 63.

65. Saad, Adelson, Cammarata, and Torres, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in the offer or sale and in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

66. As part and in furtherance of the violative conduct, Impath filed with the Commission the periodic reports described in paragraph 49. Due to the fraudulent practices in which the defendants engaged, these documents contained financial statements that materially overstated Impath's revenue and net income and other material misstatements concerning Impath's financial performance for the subject reporting periods. As a result, the periodic reports described in paragraph 49 were materially false and misleading.

67. As described in paragraphs 53-55, one or more of these materially false and misleading periodic reports were incorporated by reference in registration statements that were

signed by Saad, Adelson, Cammarata, and Torres and filed by Impath with the Commission. As a result, these registration statements were also materially false and misleading.

68. Saad, Adelson, Cammarata, and Torres knew, or were reckless in not knowing, that the registration statements that they signed, described in paragraphs 54-55, were materially false and misleading.

69. By reason of the foregoing, Saad, Adelson, Cammarata, and Torres, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13

(All Defendants)

70. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 69.

71. Impath failed to file with the Commission, in accordance with the rules and regulations prescribed by the Commission, such annual and quarterly reports as the Commission has prescribed and Impath failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they are made, not misleading, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

72. As alleged above, Impath's annual and quarterly reports described in paragraph 49 were materially false and misleading because, among other things, they included financial

statements that materially overstated Impath's revenue and net income and other material misstatements concerning Impath's financial performance.

73. Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in fraudulent practices resulting in: (a) material overstatements of Impath's revenue and net income on its books and records and in financial statements included in the periodic reports identified above; and/or (b) other material misstatements in those periodic reports.

74. At all times relevant hereto, Saad, Adelson, and Cammarata were controlling persons of Impath for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

75. By reason of the foregoing:

(a) Saad, Adelson and Cammarata are each liable as controlling persons pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Impath's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]; and unless they are enjoined, Saad, Adelson, and Cammarata will again engage, as controlling persons, in conduct that would render them liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]; and

(b) Torres, McKie, Gardner, and Jugan aided and abetted Impath's violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a), ] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13]; and unless they are enjoined, Torres, McKie, Gardner, and Jugan will again aid and abet violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13].

**FOURTH CLAIM FOR RELIEF**

**Violations of Section 13(b)(2) of the Exchange Act**

(All Defendants)

76. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 75.

77. Impath failed to:

a. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

b. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

i. transactions were executed in accordance with management's general or specific authorization;

ii. transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

iii. access to assets was permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences,

in violation of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)]. As alleged above, Impath made fraudulent revenue adjustments and other improper accounting entries on its books and records, and Impath's internal accounting controls were insufficient to reasonably assure that its annual and quarterly financial statements were prepared in conformity with GAAP.

78. Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in fraudulent practices resulting in material misstatements of Impath's revenue, net income and/or other items on its books and records and in financial statements included in the periodic reports identified in paragraph 49.

79. At all times relevant hereto, Saad, Adelson, and Cammarata, were controlling persons of Impath for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

80. By reason of the foregoing:

(a) Saad, Adelson, and Cammarata are each liable as controlling persons pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Impath's violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)]; and unless they are enjoined, Saad, Adelson and Cammarata will again engage, as controlling persons, in conduct that would render them liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)]; and

(b) Torres, McKie, Gardner, and Jugan aided and abetted Impath's violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)], and unless they are enjoined,

Torres, McKie, Gardner and Jugan will again aid and abet violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)].

## FIFTH CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1

(All Defendants)

81. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 80.

82. Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan engaged in fraudulent practices in the course of which they knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Impath that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. As alleged above, these defendants made, directed or otherwise caused fraudulent adjustments or other improper entries to Impath's books and records, or they supervised or otherwise participated in the process by which such adjustments or entries were made.

83. By reason of the foregoing, Saad, Adelson, Cammarata, Torres, McKie, Gardner, and Jugan have violated, and unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## SIXTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-2

(Saad, Adelson, Cammarata, and Torres)

84. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 83.

85. Saad, Adelson, Cammarata, and Torres, directly or indirectly, made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant, in connection with: (a) audits and examinations of the financial statements of Impath; and (b) the preparation and filing by Impath of reports required to be filed with the Commission.

86. While acting as directors and/or officers of Impath, Saad, Adelson, Cammarata, and Torres made, and caused others to make, materially false and misleading statements to accountants in connection with audits of Impath's annual financial statements and quarterly reviews of Impath's interim financial statements during the relevant period. Among other things, Saad, Adelson, Cammarata, and Torres signed materially false and misleading representation letters that management provided to Impath's Auditor with respect to those engagements.

87. By reason of the foregoing, Saad, Adelson, Cammarata and Torres have violated, and unless enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## <u>SEVENTH CLAIM FOR RELIEF</u>

### Violations of Exchange Act Rule 13a-14

(Saad)

88. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 87.

89. As Impath's chief executive officer, Saad signed a certification pursuant to Exchange Act Rule 13a-14 that was included in Impath's interim report on Form 10-Q for the quarter ended September 30, 2002. In that certification, Saad falsely stated, among other things, that: (a) the report did not contain any untrue statements of a material fact or omit to state a

material fact necessary to make the statement not misleading; (b) the financial statements and other financial information included in the report fairly present in all material respects the financial condition, results of operations and cash flows of Impath as of and for the period presented in the report; and (c) she had disclosed to Impath's auditors and Impath's audit committee all significant deficiencies and material weaknesses in the design or operation of Impath's internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in Impath's internal controls.

90. As alleged above, the financial results included in the quarterly report described in paragraph 89 were materially misstated, and the report contained other material misrepresentations as a result of fraudulent practices in which Saad participated and significant internal control deficiencies for which she was responsible. Saad failed to disclose her knowledge of Impath's fraudulent accounting practices or its significant internal control deficiencies to Impath's audit committee or its Auditor.

91. By reason of the foregoing, Saad violated and, unless enjoined, will again violate Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## EIGHTH CLAIM FOR RELIEF

### Violations of Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9

(Saad, Adelson, and Cammarata)

92. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 91.

93. Impath directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange or otherwise, solicited or permitted the use of its name to solicit proxies, consents or

authorizations in respect of non-exempt securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l]:

(A) while failing to furnish each person solicited, concurrently or previously, with a written proxy statement containing the information specified in Schedule 14A [17 C.F.R. § 14a-101] or with a written proxy statement included in a registration statement filed under the Securities Act on Form S-4 [17 C.F.R. § 239.25] and containing the information specified in such Form; and

(B) by means of a proxy statement, form of proxy statement, form of proxy, notice of meeting and other communications that contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which was false or misleading;

in violation of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

94. As alleged above, Impath filed annual proxy statements in 2002 and 2003 that contained material misstatements, and omitted to disclose material facts, concerning extra compensation received by Saad, Adelson, and Cammarata, Impath's top three executive officers.

95. As alleged above, Saad, Adelson, and Cammarata participated in the preparation of the materially false and misleading proxy statements identified in paragraph 47.

96. At all times relevant hereto, Saad, Adelson, and Cammarata were controlling persons of Impath for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

97. By reason of the foregoing, Saad, Adelson, and Cammarata are liable as controlling persons pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Impath's violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9]; and unless they are enjoined, Saad, Adelson, and Cammarata will again engage, as controlling persons, in conduct that would render them liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

A. Permanently enjoining Saad, Adelson, Cammarata, and Torres, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2];

B. Permanently enjoining Saad, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Exchange Act Rule 13a-14 [17 C.F.R. §240.13a-14];

C. Permanently enjoining McKie, Gardner, and Jugan, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1].

D. Permanently enjoining Saad, Adelson and Cammarata, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from controlling, directly or indirectly, any person who violates Sections 13(a), 13(b)(2) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2), 78n(a)] and Rules 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9].

E. Permanently enjoining Torres, McKie, Gardner, and Jugan, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

**II.**

Ordering Saad, Adelson, Cammarata, Torres, McKie, Gardner and Jugan to disgorge the ill-gotten gains they received as a result of the violations alleged above, and ordering Saad, Adelson, Cammarata, Torres, McKie, Gardner and Jugan to pay prejudgment interest thereon.

**III.**

A. Ordering Saad, Adelson, Cammarata, and Torres to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

B. Ordering McKie, Gardner, and Jugan to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Prohibiting Saad, Adelson, Cammarata, and Torres, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
March 29, 2005

MARK K. SCHONFELD
Regional Director
Northeast Regional Office

By: ______________________
Mark K. Schonfeld (MS-2798)

SECURITIES AND EXCHANGE COMMISSION
233 Broadway
New York, New York 10279
(646) 428-1650

Attorney for Plaintiff

Of Counsel:

David Rosenfeld
George N. Stepaniuk
Alan Reifenberg
David Stoelting
James K. Hanson